OPINION
Defendant-appellant Deshawn Wade appeals his conviction and sentence from the Richland County Court of Common Pleas on one count of aggravated robbery with a gun specification and two counts of felonious assault with gun specifications. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
On January 9, 1997, the Richland County Grand Jury indicted appellant on one count of aggravated robbery in violation of R.C. 2911.01, a felony of the first degree, and two counts of felonious assault in violation of R.C. 2903.11, felonies of the second degree. All three counts contained gun specifications. At his arraignment on January 21, 1997, appellant entered a plea of not guilty to the charges contained in the indictment. Thereafter, a jury trial commenced on April 10, 1997. The following evidence was adduced at trial.
On December 3, 1996, at approximately 12:30 a.m., Shakyna Cansler received a telephone call from Christina Lindsay, her neighbor, warning Cansler that Ernest Calvin Freeman and his friend were coming to rob her. At trial, Cansler testified that Freeman, a friend, had lived with her for about a week until, on December 2, 1996, she told him to leave that day. According to Cansler, shortly after receiving the telephone call, "Calvin [Freeman] beat on my door for approximately three minutes". Trial Transcript at 100-101. As Freeman was beating on her door, Cansler telephoned Christina Lindsay, told her that Freeman was knocking on Cansler's door, and asked Christina to come over.
After hanging up with Christina Lindsay, Cansler identified Freeman through the peephole in her door and opened the door a little bit for him. According to Cansler, Freeman "pushed the door open and squeezed his way in." Trial Transcript at 103. When Freeman sat on her couch, Cansler told him that she wanted him to leave. Cansler then started walking towards her front door to lock it for purposes of security. The following testimony was adduced at trial when Cansler was asked what happened when she went to lock her door:
 I'm walking toward my door, and my door just pushed open, and a guy walked in and pushed me on my couch, and is in my face before I knew it with a gun like, give me all your money, bitch. I'm like, I don't have any money. If you don't give me your money, bitch, you're going to die. Well, I say, I'm a dead bitch tonight because I don't have any money.
 I'm begging and pleading with him not to shoot me. He's got a gun. He's hitting me in my head. There's nothing I can do but beg and plead for my life, and I heard after I said I was going to be a broke bitch tonight, he said — he hit me again and he kept on telling me to give him my money. And I said, I don't have any money. I have four kids. I'm on welfare. I do not have any money. And he kept on saying, "Bitch, don't give me this shit. Give me your money, bitch."
 He's like hitting me with the gun like this, like hitting me on my head with it. And I'm saying, My kinds are in bed asleep now, please, you know, just — I don't have anything, just leave. All I have was my bank account and, you know, you know, it was right here beside my TV. It's not there anymore. Well, where's your purse, where's your purse, you know? . . .
Trial Transcript at 106-107. According to Cansler, the gunman kept telling her to "shut up"and every time he told her to "shut up", would hit her. In total, the gunman hit Cansler between eight and twelve times in the head. At one point, Cansler heard the gun click while it was pointed at her head. According to Cansler, the gunman pulled the trigger again after the telephone rang and Cansler picked it up.
At trial, Cansler testified that the gunman was black, was wearing dark clothes, and had either a long navy or black goose down coat on. The gunman, Cansler testified, was also wearing a ski mask that allowed his chin and some of his nose to be exposed, glasses, gloves and a hood. At trial, Cansler identified the gunman as appellant. When asked how she was able to identify appellant when he had a mask on his face at the time of the incident, Cansler testified that appellant `s mouth "is very distinctive". Trial Transcript at 113. Cansler further testified that she had seen appellant two or three days before the incident when he came over to her house with another man to see Freeman.
At trial, Cansler testified that, during the incident, Lamont Lindsay, her neighbor, came into her house and pushed appellant back. After hearing the gun click twice, Cansler "figured he was trying to stick me up with an empty gun" and, for such reason, took off running out of her house and pulled the door shut behind her. Trial Transcript at 123. As she was running, Cansler heard a gunshot coming from her house. Cansler then went to Christina Lindsay's residence where she remained until the police arrived and came in to talk to her. Approximately two or three minutes after Cansler gave descriptions to the police, two cruisers pulled up. While Freeman was in one cruiser, appellant was in the other. Deputy John Nicholson of the Richland County Sheriff's Department testified at trial that appellant and Freeman were found in the vicinity of the robbery wearing dark clothing. Cansler positively identified appellant as her assailant while he was sitting in the cruiser.
At trial, Christina Lindsay, Cansler's friend and neighbor, testified that between approximately 12:45 a.m. and 1:00 a.m. on December 3, 1996, she called Cansler "to let her know I had gotten word that someone was supposed to be coming to her house to rob her." Trial Transcript at 193. After Cansler indicated that she was not worried about it, the two hung up. Christina testified that later that evening, Cansler called her and asked her to come over since Freeman was knocking at Cansler's door. When Christina told Cansler that she was unable to come over, Cansler got upset and hung up. According to Christina, when she immediately called Cansler back, "she was screaming saying, I don't have anything. My kids are sleeping, . . ." Trial Transcript at 194. After the telephone went dead, Christina called Cansler back again. Christina testified that when Cansler answered the telephone, "[s]he sounded frantic". Trial Transcript at 195. Lamont Lindsay, Christina's husband, then went over to Cansler's house. Shortly thereafter, Christina heard two gunshots while observing both her husband and Cansler running from the scene of the robbery. Christina later positively identified Freeman, who she knew, as one of the two suspects arrested by police shortly after the crime.
Lamont Lindsay, Christina's husband, also testified at trial. Lamont testified that during his wife's telephone conversation with Cansler, he overheard Cansler screaming that she did not have any money. According to Lamont, Cansler was "real excited, like something was wrong." Trial Transcript at 166. When Lamont went over to Cansler's house, he pushed the door open to see what was going on. The following testimony was adduced when Lamont was asked what happened after he pushed the door open:
 A. Shakyna was saying, "Look, Dog." Looking and pointing at this guy, and I looked down at him, and I saw he had a gun in his hand. So I mainly tried to get out of the way, get away from the whole scene that way so I didn't get shot at or anything since I had came over there.
 Q. So when you opened the door, what was the first thing you saw?
 A. The first thing I saw I saw Shakyna pointing at this guy. Then I saw another guy sitting down and that was it.
Q. Do you know who the guy was that was sitting down?
A. Yes.
Q. Who was that?
A. Calvin.
Q. Now, the other man, did you recognize him?
A. No. I was — I have never seen him before.
Trial Transcript at 167. According to Lamont, the gun, which "looked like a revolver," was black with a brown handle. Trial Transcript at 170. Lamont further testified that the gunman was black, had on dark clothing, a mask, glasses, a hood and a "real puffy" longer coat that was "real dark". Trial Transcript at 168. According to Lamont, the mask covered most of the gunman's face, but left his nose exposed. When Lamont saw the gun, he turned around and ran. While running, Lamont heard two gunshots behind him. When the police arrived with appellant in a cruiser, Lamont identified appellant as the gunman after recognizing "the features of his nose", his tone of voice and his clothing. Trial Transcript at 178.
Stacy Cutlip, who testified that she knew appellant since her neighbor was dating his brother, also testified at trial. According to Cutlip, she was sitting at a female friend's house with appellant, Freeman and others at approximately 11:00 p.m. on December 2, 1996, when she saw her female friend make two telephone calls while muffling her voice. Cutlip testified that her friend called "Donna someone" and then Lamont Lindsay. Trial Transcript at 208. At approximately midnight, both appellant and Freeman left the house. According to Cutlip, appellant was wearing "a Nike first down coat, black Dickies, black Nike boots." Trial Transcript at 209. Cutlip, during direct examination, also testified that appellant owned a .22 revolver which was black with a wooden handle.
At trial, expert testimony was adduced that what was later determined to be gunpowder residue was collected from appellant's hands. In addition, testimony was adduced that appellant admitted that a pager found in the vicinity of the robbery was his pager.
At the conclusion of the evidence and the end of deliberations, the jury, on April 11, 1997, found appellant guilty of two counts of felonious assault and one count of aggravated robbery. The jury further found that appellant had a firearm on or about his person or under his control when he committed one or more of the offenses. As memorialized in a Sentencing Entry filed the same day, the trial court sentenced appellant to an 8 year term of imprisonment on the aggravated robbery charge, and to two 6 year prison terms on the felonious assault charges. The trial court further ordered that these sentences be served consecutively to each other and to the 3 year prison term on the gun specification. Appellant's aggregate prison sentence was, therefore, 23 years.
In his delayed appeal now before this Court, appellant raises the following assignments of error:
 THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 MR. WADE'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VI0LATED WHEN TRIAL COUNSEL WAIVED OPENING STATEMENT FOR NO STRATEGIC REASON.
 THE TRIAL COURT COMMITTED PLAIN ERROR IN FAILING TO SATISFY THE STATUTORY REQUIREMENTS FOR IMPOSING CONSECUTIVE SENTENCES.
 MR. WADE'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED AT SENTENCING WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE TRIAL COURT'S NON-COMPLIANCE WITH THE STATUTORY PROVISIONS GOVERNING THE IMPOSITION OF CONSECUTIVE SENTENCES, AND WHEN TRIAL COUNSEL FAILED TO SAY ANYTHING ON MR. WADE'S BEHALF.
 I
Appellant, in his first assignment of error, argues that his conviction is against the manifest weight of the evidence. We disagree.
In reviewing whether a conviction is against the manifest weight of the evidence, our standard of review is stated as follows: The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Martin
(1983), 20 Ohio App.3d 172. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins
(1997), 78 Ohio St.3d 380, 387 (quoting State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, State v. Otten (1986),33 Ohio App.3d 339, 340. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
Appellant, in the case sub judice, was convicted of two counts of felonious assault in violation of R.C. 2903.11
and one count of aggravated robbery in violation of R.C. 2911.01, all with gun specifications. R.C. 2903.11
states, in relevant part, as follows: (A) No person shall knowingly do either of the following:
 (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.
In turn, R.C. 2911.01 provides, in pertinent part, as follows:
 (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
Pursuant to R.C. 2941.145, the gun specification attached to the charges required the jury to find that appellant had a firearm on or about his person or under his control when he committed one or more of the offenses.
Based upon the evidence which is set forth in detail in the statement of facts, we cannot say that the jury lost its way so as to create a manifest miscarriage of justice. While appellant, in his brief, specifically argues that his conviction is against the manifest weight since "[w]hat is very much in question, . . . is whether Mr. Wade [appellant] was the person beneath [the] mask", we disagree. As is stated above, both Shakyna Cansler and Lamont Lindsay testified at trial that the masked gunman was wearing dark clothing, a long blue or black coat, and a mask that covered part of his face. Shortly after receiving a description of the gunman from Cansler, the police found both appellant and Freeman in the vicinity of the robbery. Appellant was wearing dark clothing and a dark coat that Cansler testified looked similar to the coat worn by the gunman. Cansler also testified that a hood appellant was wearing at the time of his arrest was "probably the hood that he [the gunman] had on his head". Trial Transcript at 112. Cansler, who testified that she had seen appellant once before when he was at her house to see Freeman, also testified that she was able to identify appellant as the gunman while he was sitting in the police cruiser based upon his "very distinctive" mouth. Trial Transcript at 113. According to Cansler, "[y]ou can tell by looking at his mouth it's very distinctive. Then when they brought him in the cruiser when I really knew exactly without the mask who he was." Trial Transcript at 113.
Moreover, Lamont Lindsay testified at trial that appellant, while sitting in the police cruiser, "had on the same clothing that I saw with the guy in the house, . . ." Trial Transcript at 174. Lamont also testified that the coat worn by appellant looked the same as the coat worn by the gunman. When asked how he was able to recognize appellant as the gunman, Lamont responded as follows: "By his nose, the features of his nose." Trial Transcript at 178. Lamont also recognized appellant by his tone of voice. According to Lamont Lindsay, "[h]e [appellant] used the same tone of voice that he was saying outside as also in the house." Trial Transcript at 179. Finally, while Stacy Cutlip testified that appellant owned a .22 black revolver with a wooden handle, Lamont Lindsay testified that the gunman had such a gun.
Based on the foregoing, we find that appellant's conviction for aggravated robbery and felonious assault, both with gun specifications, was not against the manifest weight of the evidence. The jury, as trier of fact, clearly found both Shakyna Cansler and Lamont Lindsay to be credible witnesses.
Appellant's first assignment of error is, therefore, overruled.
 II
Appellant, in his second assignment of error, contends that his right to the effective assistance of trial counsel was violated when his trial counsel waived opening statement "for no strategic reason". We disagree.
A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. Lockhart v. Fretwell (1993), 506 U.S. 364;Strickland v. Washington (1984), 466 U.S. 668; State v. Bradley (1989),42 Ohio St.3d 136. In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley,42 Ohio St.3d at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id. In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Bradley, supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id at 142.
The decision not to make an opening statement is viewed as a tactical decision to which a reviewing court must be highly deferential.Strickland v. Washington, supra; State v. Bradley, 42 Ohio St.3d at 144. See also State v. Williams (1991), 74 Ohio App.3d 686. Moreover, appellant fails to demonstrate how this decision to waive an opening statement prejudiced his defense. We agree with appellee that "in view of the overwhelming direct, circumstantial, and forensic evidence against defendant, it is not logical to conclude that a reasonable probability existed that had an opening statement been made, the outcome would have been different."
Accordingly, appellant's second assignment of error is overruled.
 III
Appellant, in his third assignment of error, maintains that the trial court committed plain error in failing to satisfy the statutory requirements for imposing consecutive sentences. As is stated above, appellant was sentenced to an 8 year term of imprisonment on the aggravated robbery charge, and to two 6 year prison terms on the felonious assault charges. The trial court further ordered that these sentences be served consecutively to each other and to the 3 year prison term on the gun specification, for an aggregate sentence of 23 years.
R.C. 2929.14 governs prison terms. Former subsection 2929.14(E), in effect at the time of appellant's crimes, states as follows:
 (3) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
Further, R.C. 2929.19(B)(2)(c) requires that a trial court state its reasons for imposing consecutive sentences.
The trial court, at the sentencing hearing, stated as follows on the record:
 THE COURT: Mr. Wade, what they described you doing was pretty serious stuff and putting a gun to somebody's head, and apparently there were bullets in that gun because whether or not they were fired, whether there being one shot or two shots were fired, I mean, but for a couple of misfires, you could have been here on a murder trial instead of armed robbery. That's a pretty serious thing to put someone else's life in jeopardy like that. It's not like you were in a struggle and defending yourself. This was a defenseless woman's life. . . .
THE COURT: What is the prosecution's recommendation, please?
MR. AULT: Mid to higher range.
 THE COURT: Mr. Wade, the most serious factors in your case are obviously the fact that what was done here was the attempt to shoot somebody and end their life. That's a very serious factor in this case. It's serious enough that I believe that consecutive sentencing is going to be required in the case. Because of your lack of a prior record, I'm not going to give you the maximum, but I think you need a series of sentences for this serious crime that was committed.
 With regard to the aggravated robbery, I'm going to sentence you to eight years in prison. On the aggravated robbery. I'm going to sentence you to six years on each of the felonies assaults, and there's a three-year gun specification. All those things are consecutive to each other.
Trial Transcript at 340-342. In its sentencing entry, the trial court indicated, in relevant part, as follows:
 The sentences are ordered to be SERVED CONSECUTIVELY as necessary to fulfill the purposes of R.C. 2929.11
because the court finds:
(û) the harm caused was great or unusual.
 (û) the defendant's criminal history requires consecutive sentences.
Clearly, the trial court, in imposing consecutive sentences on appellant, failed to make all of the necessary findings required by former R.C. 2929.14(E)(3).[1] Neither in its entry nor on the record at the sentencing hearing did the trial find that consecutive service was necessary to protect the public from future crime or to punish the offender or that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. While the trial court, in its entry, did find, pursuant to R.C. 2929.14(E)(3)(b), that "the harm was great or unusual", the trial court never expressly found that the harm was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct. Nor did the trial court specifically find that, based upon appellant's history of criminal conduct, consecutive sentences were necessary to protect the public from future crime.
Since, based on the foregoing, appellant's sentence does not comply with R.C. 2929.14(E) and, therefore, is contrary to law, appellant's third assignment of error is sustained.
 IV
Appellant, in his fourth and final assignment of error, argues that his right to the effective assistance of counsel was violated at the sentencing hearing when trial counsel failed to object to the trial court's non-compliance with the statutory provisions governing the imposition of consecutive sentences and when trial counsel failed to say anything on appellant's behalf at the sentencing hearing.
Based on our disposition of appellant's third assignment of error, appellant's fourth assignment of error is moot.
Appellant's fourth assignment of error is, therefore, overruled.
Accordingly, the judgment of conviction of the Richland County Court of Common Pleas is affirmed, but this matter is reversed and remanded as to sentencing.
By EDWARDS, J. GWIN, P.J. and WISE, J. concurs
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of conviction of the Richland County Court of Common Pleas is affirmed, but this matter is reversed and remanded as to sentencing. Costs to be paid 75% by appellant and 25% by appellee.
[1] Former R.C. 2929.14(E)(3) is now R.C. 2929.14(E)(4).